[66 NYS3d 350]

In the Matter of JOSE MONTOYA, Respondent, v LORI DAVIS, Appellant; ATTORNEY FOR THE CHILD, Appellant. (And Two Other Related Proceedings.)

Third Department, November 30, 2017

---

### APPEARANCES OF COUNSEL

*Mack & Associates, PLLC*, Albany (*Barrett D. Mack* of counsel), for Lori Davis, appellant.

*Alexander W. Bloomstein*, Hillsdale, Attorney for the Child, appellant.

*Tully Rinckey PLLC*, Albany (*Michael L. Boyle* of counsel), for respondent.

### OPINION OF THE COURT

CLARK, J.

Appeal from an order of the Family Court of Columbia County (Kehn, J.), entered May 12, 2017, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody and visitation.

Following the birth of their son in 2006 and continuing through 2009, petitioner (hereinafter the father) and respondent (hereinafter the mother) resided separately in Suffolk County. However, at some point in 2009, apparently upon the parties' consent, the mother relocated with the son to Columbia County, and the father relocated to North Carolina. At that time, by order entered October 5, 2009, upon agreement of the parties, the mother had "custody" of the child and the father had "such visitation as the parties [could] mutually agree."[1] Thereafter, pursuant to a January 2012 order, entered upon the father's default, Family Court (Koweek, J.) ordered that the father's visitation with the child be therapeutically supervised by the child's therapist, with such therapeutic visits to be paid for by the father, and that the October 2009 order "continue only to [the] extent [that it was] not inconsistent." Over the next few years, the father had a total of three therapeutic visits with the child.

---

1. Although the October 2009 order was not included in the record on appeal, the Court has obtained a copy of the order and we take judicial notice thereof (*see Matter of Nathanael G. v Cezniea I.*, 151 AD3d 1226, 1226 n 1 [2017]; *Matter of Blagg v Downey*, 132 AD3d 1078, 1079 n 1 [2015]).

In October 2015, the father commenced the first of these proceedings by filing a modification petition seeking unsupervised contact with the child. At a January 2016 appearance on the father's petition, Family Court (Kehn, J.) appointed a forensic evaluator to conduct a neutral forensic custodial evaluation, which the evaluator completed the following month.[2] In March 2016, the mother filed a family offense petition against the father, alleging that he committed harassment in the first or second degree by incessantly sending her text messages that accused her of interfering with the father's relationship with the child. The following month, in April 2016, the court temporarily awarded the father unsupervised visits with the child and directed the forensic evaluator to prepare an updated report. The mother then moved, by order to show cause, to suspend the father's unsupervised contact with the child. After the forensic evaluator completed her updated report in May 2016, the father filed a second modification petition—which he subsequently amended—seeking joint legal and primary physical custody of the child.

Following a fact-finding hearing and a *Lincoln* hearing, Family Court, among other things, granted the father sole legal and primary physical custody of the child, suspended the mother's parenting time with the child "for a period of no less than six months" and conditioned the mother's future contact with the child upon her participation in counseling.[3] The court also ordered the mother to sign a release in favor of the Attorney for the Child "so that her compliance with treatment [could] be monitored" and directed that, following court approval, the mother's contact with the child be in a therapeutic environment. Both the mother and the Attorney for the Child appeal.[4]

The parties do not dispute that there has been a change in circumstances since entry of the prior order of custody and, as

---

**2.** Given the poor quality of the transcription of this proceeding, it is unclear whether the mother or her attorney were present at the time that the forensic evaluation was discussed. Thus, it is unclear whether the mother understood the nature and purpose of the evaluation and, in fact, her first interaction with the forensic evaluator suggests that she did not.

**3.** The mother did not present any proof at the fact-finding hearing in support of her family offense petition, which Family Court ultimately dismissed.

**4.** Upon the mother's motion, Family Court's order has been stayed pending appeal and a temporary order of visitation for the father remains in effect.

such, the primary issue before us is whether the child's best interests were served by Family Court's order (*see Matter of Nathanael G. v Cezniea I.*, 151 AD3d 1226, 1227 [2017]; *Matter of Walter TT. v Chemung County Dept. of Social Servs.*, 132 AD3d 1170, 1170-1171 [2015]; *Matter of Blagg v Downey*, 132 AD3d 1078, 1079 [2015]). In assessing which custodial arrangement will serve the best interests of the child, courts consider, among other factors, the parents' relative fitness, stability, ability to provide for the child's overall well-being, past performances, home environments and willingness and ability to foster a positive relationship between the child and the other parent (*see Matter of Paluba v Paluba*, 152 AD3d 887, 888-889 [2017]; *Matter of Emmanuel SS. v Thera SS.*, 152 AD3d 900, 901-902 [2017], *lv denied* 30 NY3d 905 [2017]). Upon extensive review of the record, we find that a sound and substantial basis does not exist to support Family Court's determination to grant the father sole legal and primary physical custody of the child, suspend the mother's parenting time for a period of no less than six months and direct that, following her participation in counseling and court approval, the mother's contact with the child be in a therapeutic environment.

At the fact-finding hearing, the father primarily relied upon the testimony and updated forensic evaluation report of the court-appointed forensic evaluator to support his request for joint legal and primary physical custody of the child. The forensic evaluator testified, in accordance with her updated report, that the mother had engaged in parental alienation to such a high degree that the only viable resolution was to award the father primary physical custody of the child and to direct that the mother have no contact whatsoever with the child for at least the first six months of the new custodial arrangement.[5] Notwithstanding the strong position taken by the forensic evaluator, our review of the record leads us to conclude that her opinions and recommendations were afflicted by a pervasive and manifest bias against the mother, which should have alerted Family Court to their questionable reliability.

---

**5.** Although the mother failed to preserve her argument that the forensic evaluator's opinions and recommendations were scientifically flawed, the Court is concerned about the forensic evaluator having been deemed an expert in "parental alienation," which is not a diagnosis included in the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders. We further note that, in the criminal context, "parental alienation syndrome" has been rejected as not being generally accepted in the scientific community (*see People v Fortin*, 184 Misc 2d 10 [2000], *affd* 289 AD2d 590, 591 [2001], *lv denied* 97 NY2d 754 [2002]).

It is apparent from our review of the testimony that, although paid to conduct a neutral forensic custodial evaluation, the forensic evaluator failed to remain objective, abdicated her role as a neutral evaluator and, ultimately, became an overly zealous advocate for the father. Throughout her testimony, the forensic evaluator consistently denigrated the mother and her husband and offered broad-sweeping characterizations of the parties, which appeared to be mostly informed by the father's version of events and point of view. She was unable to answer simple yes-or-no questions without editorializing and using vitriolic language directed at the mother. In contrast, the forensic evaluator regularly praised and defended the father, painting his failings—including his inconsistent and limited presence in the child's life over a period of at least three years—as being completely at the hands of the mother and through "no fault" of the father. The forensic evaluator portrayed the father as blameless, although such position conflicted with her prior conclusion—reached in her initial report—that the father "own[ed] some of the liability" due to his failure to "follow[ ] through" and "be[ ] consistent with his contact with [the child]."[6] Moreover, the forensic evaluator discounted the possibility that the child may have his own feelings, independent of any interfering conduct by the mother and her husband, about the father's inconsistent presence in his life.

Additionally, with little to no explanation, the forensic evaluator's recommendation drastically changed from her February 2016 report to her May 2016 updated report. Although the forensic evaluator concluded in both reports that the mother had engaged in alienating behavior, she did not recommend a change in physical custody in her first report, reasoning that the mother "ha[d] been the longstanding primary care parent and [that the child] ha[d] been subjected to too many parental losses." Rather, the forensic evaluator recommended that the father have visitation with the child for four to five hours on Saturday and Sunday on the third weekend of the month and that the parties separately participate in a parenting course that focused on how to coparent successfully. In stark contrast, in her updated report, the forensic evaluator stated that the "only viable remedy" to address the mother's alienating

---

**6.** Like in her testimony, the forensic evaluator stated in her updated report—completed only three months after the initial report—that the father had "demonstrated a consistent effort to see [the child]."

behavior was a change in physical custody, so that the child could be "deprogrammed and reunify with his loving father." The forensic evaluator did not explain why her recommendation had changed so dramatically or address her prior concerns about removing the child from his longstanding primary caretaker and subjecting him to another parental loss. Nor did the forensic evaluator state how she was able to reach this new recommendation without again meeting with the mother (*see Matter of Nikolic v Ingrassia*, 47 AD3d 819, 821 [2008]; *see generally Matter of Stellone v Kelly*, 45 AD3d 1202, 1204 [2007]),[7] who refused to participate in the update—apparently at the advice of counsel.

The impartiality of the forensic evaluator was further called into question by her pattern of discounting the qualifications and opinions of nearly every collateral source that she came into contact with while preparing her reports. For instance, as reflected in the forensic evaluator's initial report, the licensed clinical social worker who conducted the three therapeutic visits between the father and the child stated that she terminated the visits "because of the inconsistency of contact between [the father] and [the child]." During her testimony, the forensic evaluator attempted to explain the father's lack of consistency, stating that there were "many obstacles" that prevented the father from continuing therapeutic visits with the child, including his inability to afford the therapeutic visits, related travel expenses and time away from work. Rather, she blamed the lack of consistency on the mother's refusal to pay for the visits through her health insurance, ignoring the fact that, pursuant to the January 2012 order, the father was required to bear the expense of the therapeutic visits. The forensic evaluator's interactions with the child's school counselor were also of concern, as she stated, without explanation, that the counselor "became defensive" during the course of their conversation and "hung up on [her]." The forensic evaluator further exceeded the bounds of her role as a neutral court-appointed evaluator by suggesting to the Attorney for the Child, while testifying, that she should substitute her judgment for that of the child (*see generally Matter of Cunningham v Talbot*, 152 AD3d 886, 887 [2017] [discussing a circumstance under which an Attorney for the Child may appropriately substitute judgment for the child]).

---

7. Ironically, the forensic evaluator criticized the child's school counselor for basing her opinions solely on the mother's reports, without receiving any input from the father.

In its decision and order, Family Court recognized that the testimony given by the forensic evaluator "demonstrated[,] at times[,] a little less than neutral tone" and that it was apparent from her testimony that she was "challenged in her dealings" with the mother and her husband. Nevertheless, Family Court wholly adopted the forensic evaluator's factual assertions, opinions, conclusions and recommendations, without any perceivable independent consideration given to the best interests of the child. In doing so, the court improperly delegated its fact-finding role and ultimate determination to the forensic evaluator (*see generally Matter of Millett v Millett*, 270 AD2d 520, 522 [2000]; *compare Moor v Moor*, 75 AD3d 675, 677 [2010]; *Matter of Vezina v Vezina*, 8 AD3d 1047, 1047 [2004]; *Salerno v Salerno*, 273 AD2d 818, 819 [2000]; *Matter of Aldrich v Aldrich*, 263 AD2d 579, 579 [1999]). We emphasize that "[t]he recommendations of court[-]appointed experts are but one factor to be considered" and, although entitled to some weight, such recommendations are not determinative and should not usurp the trial court's independent impressions of the evidence and conclusions drawn from that evidence (*Matter of Nikolic v Ingrassia*, 47 AD3d at 821; *see Baker v Baker*, 66 AD3d 722, 723 [2009], *lv dismissed* 13 NY3d 926 [2010]; *Matter of Kozlowski v Mangialino*, 36 AD3d 916, 917 [2007]; *Matter of Maliha v Maliha*, 13 AD3d 1032, 1033 [2004]).

There was certainly evidence in the record to support the conclusion that the mother, along with her husband, interfered with the father's access to the child and struggled with the concept and spirit of coparenting. Nevertheless, while we are mindful that a custodial parent's interference with the relationship between the child and the noncustodial parent raises a question as to that parent's fitness to serve as the custodial parent (*see Matter of Joseph WW. v Michelle WW.*, 118 AD3d 1054, 1056-1057 [2014]; *Matter of Bennett v Schultz*, 110 AD3d 792, 793 [2013]; *Matter of Lattuca v Natale-Lattuca*, 293 AD2d 805, 806 [2002]), Family Court's decision and order did not reflect an independent balancing of factors to determine the best interests of the child.

Significantly, in granting the father sole legal and primary physical custody of the child, Family Court did not engage in an assessment of the relocation factors (*see Matter of Tropea v Tropea*, 87 NY2d 727, 740-741 [1996]; *Matter of Hempstead v Hyde*, 144 AD3d 1438, 1439 [2016]; *Matter of Finkle v Scholl*, 140 AD3d 1290, 1291 [2016]). Had the court done so, it would

have been apparent that the father's proof was lacking in this regard. Neither the father nor the forensic evaluator offered demonstrable proof, such as photographs or a home study, as to the suitability of the father's home. In commenting on the quality of the father's home environment, the forensic evaluator relied solely on her assumptions and the self-serving representations made by the father. Additionally, the father did not present any evidence with respect to the school that the child— who has been diagnosed with autism and attention deficit hyperactivity disorder and takes multiple daily prescription medications—would be attending if he were to relocate to North Carolina, the services that would be available for the child at that school or the potential health care providers that could see the child (*see Matter of Woodrow v Arnold*, 149 AD3d 1354, 1356 [2017]; *Matter of Angela N. v Guy O.*, 144 AD3d 1343, 1346-1347 [2016]). In fact, the father testified that he had not investigated the schools that the child could attend in North Carolina, stating that he only knew that they were "really good schools." At no point did the father's testimony demonstrate that he had given any thought to the day-to-day practicalities of providing for the child's physical, emotional, developmental and educational well-being in North Carolina. Further, the father's testimony centered on his visits with the child only since February 2016 and ignored the fact that he had minimal contact with the child from at least 2012 to 2015. Moreover, the father's testimony demonstrated that the child did not have an existing relationship with the father's wife or two other children.

By comparison, the record established that the child has lived his entire life in New York, with the mother as his primary custodian. The mother testified that the child has an "[e]xcellent" relationship with her husband, and the mother's husband stated that, since first meeting the child, his relationship with the child had grown a great deal. Additionally, both the mother and her husband testified that the child has close relationships with his half sister and half brother. The mother and the husband consistently testified that the child is particularly close to his half brother, who the husband described as the child's "best friend[ ]." The mother similarly stated that the child and his half brother were "inseparable" and, because they are fairly close in age, participated in sports and a 4H club together. By all accounts, the child is also attached to his numerous family pets. Further, the mother dem-

onstrated a history of successfully advocating for the developmental and educational needs of the child by securing appropriate individualized education programs for the child.[8] Moreover, the child's strong desire to remain in the custody of the mother and his fear of being forced to move to North Carolina permeates the record. While not dispositive, the child's wishes are informative (*see Matter of Williams v Rolf*, 144 AD3d 1409, 1414 [2016]; *Matter of Gerber v Gerber*, 141 AD3d 901, 903 n [2016]).

In short, given Family Court's wholesale adoption of the forensic evaluator's tainted recommendation, without any perceivable independent consideration given to the multitude of factors that inform a determination as to which custodial arrangement will serve the best interests of the child, we find that Family Court's determination is not supported by a sound and substantial basis in the record (*compare Matter of Gerber v Gerber*, 133 AD3d 1133, 1137-1139 [2015], *lv denied* 27 NY3d 902 [2016]; *Matter of Zakariah SS. v Tara TT.*, 143 AD3d 1103, 1104-1106 [2016]). As the record is sufficiently developed to permit us to exercise our independent authority to review the evidence to determine which custodial arrangement is in the child's best interests, we need not remit the matter (*see Matter of Cree v Terrance*, 55 AD3d 964, 966 [2008], *lv denied* 11 NY3d 714 [2008]; *Matter of Somerville v Somerville*, 307 AD2d 481, 483 [2003]; *Matter of Burnham v Basta*, 241 AD2d 628, 629 [1997], *lv denied* 90 NY2d 812 [1997]).

Having given due consideration to, among other things, the evidence of the mother's interference with the father's relationship with the child, the relocation factors (*see Matter of Tropea v Tropea*, 87 NY2d at 740-741) and the testimony received at the *Lincoln* hearing, we modify Family Court's May 2016 order to the extent set forth below. The mother and the father shall have joint legal custody of the child, with the mother having primary physical custody. The parties shall discuss all health, education and welfare issues regarding the child prior to decision making. If the parties cannot agree on a resolution of an issue after discussing and sincerely trying to reach a consensus,

---

8. Despite her assertions that the child has grown up in a "chaotic" and "dysfunctional" household, the forensic evaluator testified that the child was "sweet," "calm" and "lovely." Interestingly, rather than afford any credit to the mother for the child's upbringing, the forensic evaluator attributed the child's demeanor wholly to genetics, stating that the child and the father were "exactly the same."

the mother shall make said decision. The mother shall execute any releases necessary for the father to access any medical and/or academic information concerning the child and, as the mother should have already provided the father a list of all of the child's health care and academic providers in accordance with this Court's June 15, 2017 order resolving the mother's motion for a stay pending appeal, the mother shall keep the father apprised of any changes to the child's health care and academic providers.

If the father has not already done so in accordance with this Court's June 15, 2017 order, the father and the child shall have a minimum of two therapeutic sessions with Tamie O'Neil or the child's current counselor as soon as practicable. The mother shall insure that the child attends the sessions with the father and continues in treatment to address his relationship with his father. The father may, if he chooses, have parenting time with the child on the first and third weekend of every month for a period of at least four hours on both Saturday and Sunday, which may include overnight visits. The father shall designate the time, length and location of this parenting time, being mindful of the child's schedule and upon giving 48 hours' notice to the mother. If the location of said parenting time is more than 60 miles from the child's home, the father is responsible for all transportation past the 60 miles.

The father shall also have the child during the child's summer vacation on an alternating yearly schedule. In even years, said parenting time shall be from July 29 to August 26 and, in odd years, from July 1 to July 29. The father shall pick up and drop off the child at the mother's residence for his summer parenting time in 2018. In all other years, the mother will bring the child to the father's residence in North Carolina and the father will return the child to the mother's residence at the end of his parenting time.

The parties shall alternate the child's Thanksgiving break from school, with the mother having the child in even years and the father having the child in odd years. The father's parenting time during the Thanksgiving break shall commence on the first full day that the child is off from school and continue until the Sunday after Thanksgiving. The parties will meet at a mutually agreed-upon halfway point between the mother's residence and the father's residence for the pickup and drop off of the child at the beginning and end of the father's parenting time during Thanksgiving break.

In 2017, the father shall have the child during the child's Christmas break, with such parenting time beginning on December 26, 2017, and continuing until January 1, 2018. This time may be in North Carolina. In all other years, the parties shall alternate the child's Christmas break from school, with the mother having the child in odd years and the father having the child in even years. With the exception of 2017, the father's parenting time during Christmas break shall commence on the first full day that the child is off from school and end on the last full day that the child is off from school. The parties will meet at a mutually agreed-upon halfway point between the mother's residence and the father's residence for the pickup and drop off of the child at the beginning and end of the father's parenting time during Christmas break.

Further, the father shall have the child each year during the child's spring break from school, with such parenting time to commence on the first full day that the child is off from school and continue until the last full day that the child is off from school. The parties shall meet at a mutually agreed-upon halfway point between the mother's residence and the father's residence for the pickup and drop off of the child at the beginning and end of the child's spring break. The father shall have such other parenting time as the parties may agree.

The mother and the father shall have reasonable phone and audio/visual contact with the child while in the other party's care. If the child is unavailable at the time of contact, the party with the child shall have the child call the other parent back that day. The mother and the father shall separately enroll in, and complete, a parenting class to learn coparenting skills. The mother is ordered to encourage the child to attend parenting time with the father, refrain from interfering with the father's parenting time and insure that no third parties or other family members interfere with the father's parenting time. The parties shall not discuss or allow a third party to discuss court proceedings with, or in front of, the child. The parties shall not disparage or denigrate the other party or their spouses in the presence of the child or permit any third party to do so. The parties and their spouses shall refrain from any assaulting, harassing, threatening or other violent conduct in the presence of the child. The mother and the father shall insure that the child does not call any other individual, except the biological parents, mother/father or any variation thereof. Finally, the parties must immediately advise each other of any changes to their contact information.

While we need not reach the issue of whether Family Court improperly conditioned the mother's future visits with the child upon her participation in counseling, we briefly note that such a condition is patently improper (*see Matter of Saggese v Steinmetz*, 83 AD3d 1144, 1145 [2011], *lv denied* 17 NY3d 708 [2011]; *Matter of Tucker v Tucker*, 249 AD2d 643, 645 [1998]; *Matter of Mongiardo v Mongiardo*, 232 AD2d 741, 743 [1996]). As for the remaining arguments, they have been reviewed and found to be without merit.

McCarthy, J.P., Lynch, Rose and Pritzker, JJ., concur.

Ordered that the order is modified, on the law, without costs, by reversing so much thereof as awarded petitioner sole legal and primary physical custody of the child; petitioner and respondent are awarded joint legal custody of the child, respondent is awarded primary physical custody and petitioner is awarded parenting time as specifically set forth herein; and, as so modified, affirmed.