Matter of Tiffany W. v James X. (2021 NY Slip Op 04175)





Matter of Tiffany W. v James X.


2021 NY Slip Op 04175


Decided on July 1, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 1, 2021

531570
[*1]In the Matter of Tiffany W., Appellant,
v
James X. et al., Respondents. (Proceeding No. 1.)
In the Matter of Alicia W., Respondent,
v
Tiffany W., Appellant, and James X., Respondent. (Proceeding No. 2.) (And Two Other Related Proceedings.)

Calendar Date:May 27, 2021

Before:Garry, P.J., Lynch, Clark, Aarons and Colangelo, JJ.

Lisa K. Miller, McGraw, for appellant.
Christopher Hammond, Cooperstown, for James X., respondent.
Michelle I. Rosien, Philmont, for Alicia W., respondent.
Palmer J. Pelella, Binghamton, attorney for the children.



Colangelo, J.
Appeals (1) from a corrected order of the Family Court of Broome County (Connerton, J.), entered June 5, 2020, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, to modify a prior order of custody, and (2) from an order of protection entered thereon.
Tiffany W. (hereinafter the mother) and respondent James X. (hereinafter the father) are the parents of two children (born in 2005 and 2009). In January 2016, pursuant to a stipulation between the parents and Alicia W., the mother's half sister (hereinafter the aunt), Family Court awarded the parents joint custody of the children, with primary residential custody to the aunt, and set forth specific parenting time to the mother and nonspecific parenting time to the father, and both parents were given access to the children's education and medical records and providers. In addition, the mother was ordered to "ensure [that] the [children] have no contact with" an individual who fathered the mother's youngest child and who had committed acts of domestic violence against the mother (hereinafter the stepfather). In May 2019, the mother filed an amended custody modification petition (proceeding No. 1) seeking to increase visitation, hoping that the children would be returned to her prior to the start of the September 2020 school year, which was opposed by the father and the aunt. In June 2019, while the mother's petition was pending, the aunt filed a modification petition seeking, among other things, full legal custody as to the mother and joint legal custody with the father. The aunt simultaneously filed a violation petition against the mother, alleging that the mother permitted the children to have contact with the stepfather, and a family offense petition against the mother, alleging that the mother committed various harassment-related offenses and seeking an order of protection. Following a fact-finding hearing and Lincoln hearings with each child, Family Court, by corrected order entered in June 2020, dismissed the mother's modification petition and granted the aunt's modification petition, awarding her joint custody with the father, with primary residence with the aunt, and specific parenting time to the mother and parenting time with the father as agreed to by the aunt. The court also found that the mother had willfully violated the 2016 order by "permit[ting] her daughters to have contact with the [stepfather]," but imposed no punishment for her contempt. Finally, the court granted the family offense petition and issued a one-year order of protection against the mother. The mother appeals.
"A parent's claim to custody of his or her children is superior to that of all others absent a showing of surrender, abandonment, persistent neglect, unfitness, an extended disruption of custody or other like extraordinary circumstances" (Matter of Tamika B. v Pamela C., 187 AD3d 1332, 1334 [2020] [internal quotation marks and citations [*2]omitted]; see Matter of Bennett v Jeffreys, 40 NY2d 543, 544 [1976]; see Matter of Donald EE. v Cheyenne EE., 177 AD3d 1112, 1113 [2019], lvs denied 35 NY3d 903 [2020]). "The extraordinary circumstances analysis must consider the cumulative effect of all issues present in a given case, including, among others, the length of time the child[ren] ha[ve] lived with the nonparent, the quality of that relationship and the length of time the parent allowed such custody to continue without trying to assume the primary parental role" (Matter of Tamika B. v Pamela C., 187 AD3d at 1334-1335 [internal quotation marks, brackets and citations omitted]; see Matter of Michael P. v Joyce Q., 191 AD3d 1199, 1200 [2021], lv denied 37 NY3d 902 [2021]; Matter of Melissa MM. v Melody NN., 169 AD3d 1280, 1281-1282 [2019]). In this case, there has been no prior finding of extraordinary circumstances and, as such, the aunt had the "heavy burden of establishing extraordinary circumstances" (Matter of Tamika B. v Pamela C., 187 AD3d at 1335 [internal quotation marks and citations omitted]; see Matter of Damascus LL. v Janelle MM., 176 AD3d 1408, 1409 [2019]; Matter of Chasity CC. v Frederick DD., 165 AD3d 1412, 1414 [2018]). "[I]f that burden is met, the court must then determine what custodial arrangement is in the children's best interests" (Matter of Tamika B. v Pamela C., 187 AD3d at 1335; see Matter of Chasity CC. v Frederick DD., 165 AD3d at 1414; Matter of Peters v Dugan, 141 AD3d 751, 752-753 [2016]).
The testimony at the fact-finding hearing established that the mother ceded physical custody of her children to the aunt in April 2015. At that time, the mother was in a relationship with the stepfather and living with the children in Florida. After the mother became homeless and the children stopped attending school, the mother asked the aunt to "come get the girls, because they didn't have anywhere to stay." The aunt drove to Florida, picked up the children and was given a kinship form, signed by the mother, granting the aunt decision-making authority for the children for six months. The mother returned to New York in May 2015. In June 2015, following a text message dispute between the mother and the aunt, the aunt filed for sole custody of the children, resulting in the 2016 order. Prior to filing her modification petition, the mother has permitted this custodial arrangement to remain without seeking to resume her parental role.[FN1]
The testimony further demonstrated that the mother has a long history of alcohol abuse and little concern that her continued alcohol use could ruin her chances of regaining custody. The mother was twice convicted of driving while intoxicated (hereinafter DWI), with the second arrest for DWI occurring in 2017 at 3:00 a.m. while her youngest child, then age 3, was in the car with her and while she was on probation for the first DWI conviction. The mother thereafter pleaded guilty to felony DWI and, in addition to a felony conviction[*3], the mother was convicted of violating the terms of her probation. In this regard, the mother admitted that while her felony charge was pending, she purchased a bottle of wine, despite knowing that the purchase of alcohol was a violation of her probation that could result in her return to jail. The mother testified that she was not currently in treatment for alcohol abuse, denied being an alcoholic but admitted to having "issues with overindulgence." The mother also admitted that she may have consumed alcohol in 2019.
The mother further testified that she was involved in an abusive relationship with the stepfather during the time that the children were residing with the aunt. She described the stepfather as a violent man against whom she had obtained an order or protection. However, and despite completing a domestic violence program, the mother resumed a relationship with the stepfather and was abused by him again. During this particular incident, the stepfather assaulted her, causing serious injuries to her leg. The mother was aware that the children were afraid of the stepfather, due to his prior misconduct, and that he was not to have contact with them. Nevertheless, in June 2018, during her Saturday parenting time, the mother took the children with her to meet the stepfather in the parking lot of his apartment building and admitted that the children could see him from her car. The hearing testimony also established that the mother cancelled or shortened a series of visits with the children to, among other things, go on a double date or babysit someone else's children for pay. Moreover, the mother has demonstrated little interest in participating in the children's lives. As the testimony established, the mother has never called the children's school district to find out which school they attend or the names of their teachers, to inquire about their educational progress or to obtain their sports schedules, and she has attended only three of the children's sporting events during the past five years.
In our view, and according deference to Family Court's factual findings and credibility determinations, the foregoing reflects an "overall pattern by the mother of placing her own interests and personal relationships ahead of the child[ren] in a manner that constituted extraordinary circumstances" (Matter of Perry v Perry, 160 AD3d 1144, 1145-1146 [2018] [internal quotation marks, brackets and citations omitted]; Matter of Peters v Dugan, 141 AD3d at 753). Having established extraordinary circumstances, the inquiry shifts to a best interests analysis, which involves weighing factors that include "maintaining stability in the children's lives, the quality of the respective home environments, the length of time the present custody arrangement has been in place and each party's past performance, relative fitness and ability to provide for and guide the children's intellectual and emotional development" (Matter of Damascus LL. v Janelle MM[*4]., 176 AD3d at 1410 [internal quotation marks, brackets and citations omitted]; Matter of Wendy KK. v Jennifer KK., 160 AD3d 1059, 1061 [2018]).
At the time of the hearing, the children, who were in ninth grade and fifth grade, had been living with the aunt for more than five continuous years and were well cared for by her. The aunt engaged with their schools, attended their sporting events and oversaw their medical care. The aunt testified to a well-structured routine wherein the children are always supervised and nurtured. The children have also developed a close relationship with the aunt's mother, who has lived with them since March 2018 and cares for them in the aunt's absence. The testimony established that the aunt and the children enjoy many activities together, such as attending concerts and movie nights at home, and, significantly, the children regularly share their experiences at school, with their friends or with the aunt. The children are doing well in school and have had no disciplinary issues. As Family Court correctly found, the aunt "has provided them with full, rich, warm lives, meeting both their physical and emotional needs."
The mother, on the other hand, has not made any attempt to access information about the children's school, sports schedules or medical care, notwithstanding the steps she could have taken under the prior order. Unfortunately, the mother and the aunt do not communicate effectively, and their poor relationship, which Family Court found was largely due to the mother, has negatively impacted the aunt's ability and desire to nurture the relationship between the mother and the children. The mother has, on several occasions, declined additional visitation offered to her. During the fall of 2017, the mother and the aunt agreed to increase the mother's visitation, and the mother started visiting on an expanded basis, which included four or five overnights. After the mother was arrested for DWI, the expanded visits ceased. The mother has phone contact with the children approximately once per week, although the contact is inconsistent and never initiated by the children.
The aunt has fostered a close relationship between the children and the father, taking them to visit the father while he was incarcerated and, since his release, allowing him to visit with the children in her home. The testimony established that the father speaks to the children on a nightly basis and has demonstrated a genuine effort to build a relationship with them. The hearing testimony also established that the children are happy at school and in their current school district. If the mother were awarded custody, their school district would change. Further, the mother was unable to testify as to suitable after school child care for the children if they lived with her.
In determining the children's best interests, Family Court was in a superior position to observe and evaluate the testimony elicited during the fact-finding hearing[*5]. "Great deference is accorded to [Family Court's] credibility assessments and factual findings, and we will not disturb its custody determination so long as it is supported by a sound and substantial basis in the record" (Matter of Paul Y. v Patricia Z., 190 AD3d 1038, 1041 [2021] [internal quotation marks and citations omitted]; see Matter of Sweeney v Daub-Stearns, 166 AD3d 1340, 1342 [2018]; Matter of Marcia ZZ. v April A., 151 AD3d 1303, 1305-1306 [2017]). It is clear that stability will be served by maintaining the children in their home with the aunt, their longtime caregiver, and there are no obvious concerns about either the aunt or her home (see Matter of Damascus LL. v Janelle MM., 176 AD3d at 1410-1411). It is further noted that, "although not determinative, Family Court's custody determination is consistent with the position of the attorney for the child[ren]" (Matter of Dellapiana v Dellapiana, 161 AD3d 1228, 1231 [2018]). We therefore find that Family Court's custodial award is in the best interests of the children.
The mother next argues that Family Court erred in finding that she committed a family offense and in issuing a one-year order of protection in favor of the aunt. We disagree. As relevant here, a person commits harassment in the second degree "when, with intent to harass, annoy or alarm another person
. . . [h]e or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose" (Penal Law § 240.26 [3]; see Family Ct Act § 812). "Although an isolated incident cannot support a finding of harassment, a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose can support such a finding" (Matter of Marvin I. v Raymond I., 193 AD3d 1279, 1279 [2021] [internal quotation marks and citations omitted]). As the person seeking an order of protection, the aunt had the burden of showing, by a preponderance of the evidence, that the mother committed one or more family offenses (see Matter of Paul Y. v Patricia Z., 190 AD3d at 1042; Matter of Allen v Emery, 187 AD3d 1339, 1339 [2020]; Matter of Putnam v Jenney, 168 AD3d 1155, 1156 [2019]). "Whether a family offense has been committed is a factual issue to be resolved by Family Court, and its determinations regarding the credibility of witnesses are entitled to great weight on appeal" (Matter of Paul Y. v Patricia Z., 190 AD3d at 1042 [internal quotations marks and citations omitted]).
The aunt testified that the mother engages in frequent and inappropriate name calling in text messages, often in profane and contemptuous terms. In particular, the mother sent text messages to the aunt on February 9, 2019 and February 19, 2019, in which she called the aunt by certain pejorative names and insults. The mother admitted to such conduct. The mother has also referred to paying child support as "scam money." The aunt testified that the [*6]messages were "overwhelming" and "frustrating" and she characterized the communications as conduct "to the point of severe annoyance." The mother did not deny sending the messages and claimed that all of the name calling was due to frustration and stress. She had been annoyed that a visit with the children was postponed in favor of the father's weekend visitation. She also resented paying child support and having her tax refund intercepted by the Child Support Collection Unit. As Family Court properly found, the mother's communications served no legitimate purpose. Deferring to the court's credibility determinations in favor of the aunt, and "mindful that the requisite intent may be inferred from the [mother's] conduct itself, as well as the surrounding circumstances," we agree with Family Court that the aunt established, by a preponderance of the evidence, that the mother committed the family offense of harassment in the second degree (Matter of Joan WW. v Peter WW., 173 AD3d 1380, 1382 [2019]; see Matter of Marianna K. v David K., 145 AD3d 1361, 1363 [2016]), and that an order of protection against the mother was properly issued.
We find, however, that Family Court erred in concluding that the mother willfully violated the 2016 order when she "permitted her daughters to have contact with [the stepfather]" as set forth in the eighth ordered paragraph of the June 2020 corrected order. Although the court declined to impose punishment, its finding of a willful violation, civil contempt, cannot be sustained. "To sustain a finding of civil contempt for a violation of a court order, a petitioner must show by clear and convincing evidence that there was a lawful court order in effect that clearly expressed an unequivocal mandate, that the person who allegedly violated the order had actual knowledge of its terms, and that his or her actions or failure to act defeated, impaired, impeded or prejudiced a right of the moving party" (Matter of Wesko v Hollenbeck, 149 AD3d 1175, 1175-1176 [2017] [internal quotation marks and citations omitted]). The court recognized that "[the mother's] behavior certainly violates the spirit of the [2016] order . . . [but] [t]here is no indication that the children had contact with [the stepfather] as they remained in a car." The court then clarified to specifically provide in the June 2020 order that the "[mother] shall not permit [the stepfather] to be within sight or earshot of the children when they are with their mother." Accordingly, we find that the order alleged to have been violated — the 2016 order — failed to express an unequivocal mandate and, as such, the finding that the mother willfully violated said order must be reversed.
Garry, P.J., Lynch, Clark and Aarons, JJ., concur.
ORDERED that the corrected order is modified, on the law, without costs, by reversing so much thereof as granted Alicia W.'s violation petition; said petition dismissed; and, as so modified, affirmed.
ORDERED that the order [*7]of protection is affirmed, without costs.



Footnotes

Footnote 1: Notably, the mother has twice sought to modify the 2016 order but failed to appear in court to continue the hearings on both petitions, resulting in their dismissal.