Matter of Jared MM. v Mark KK. (2022 NY Slip Op 03032)

Matter of Jared MM. v Mark KK.

2022 NY Slip Op 03032

Decided on May 5, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 5, 2022

532516
[*1]In the Matter of Jared MM., Appellant,
v
Mark KK., Respondent, et al., Respondent. (Proceeding No. 1.)
In the Matter of Mark KK., Respondent,
v
Janine LL., Respondent, and Jared MM., Appellant. (Proceeding No. 2.) (And Another Related Proceeding.)

Calendar Date:March 23, 2022

Before:Egan Jr., J.P., Clark, Ceresia and Fisher, JJ.

Robert N. Gregor, Lake George, for appellant.
Bartlett, Pontiff, Stewart & Rhodes, PC, Glens Falls (Paula Nadeau Berube of counsel), for Mark KK., respondent.
Karen R. Crandall, Schenectady, attorney for the child.

Clark, J.
Appeal from an order of the Family Court of Washington County (Wait, J.), entered November 16, 2020, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, to modify a prior order of custody and visitation.
Jared MM. (hereinafter the father) and Janine LL. (hereinafter the mother) are the parents of a child (born in 2015). In April 2016, the parents filed initial custody petitions against one another, and, while those petitions were pending, the Washington County Department of Social Services (hereinafter DSS) filed a neglect petition against each parent. Relevant here, the petition against the father set forth allegations of domestic violence committed against the mother in front of the child — allegations which were premised upon the father's statements during interviews with DSS. A maternal great aunt (hereinafter the aunt) then petitioned for custody of the child. In October 2016, the mother consented to a finding of neglect without admission with the understanding that the neglect proceeding against her would be adjourned in contemplation of dismissal, and an order to that end was entered. Family Court also entered a second order in October 2016 (hereinafter the October 2016 order) whereby legal custody of the child would be shared among the father, the mother and the aunt, with the mother and the aunt sharing physical custody. As for the neglect proceeding against the father, in January 2017, the father executed an unconditional, irrevocable judicial consent to a private placement adoption pursuant to Domestic Relations Law § 115-b, and, after that relinquishment of his parental rights to the child, DSS withdrew the neglect petition against him.
In the summer of 2017, the mother and the aunt filed petitions against one another to modify the October 2016 order. In October 2017, Family Court (Kershko, J.) entered an order, seemingly on consent, vacating the October 2016 order and any other orders of custody pertaining to the child. The October 2016 order having been vacated, and the father having essentially surrendered his parental rights, sole legal and physical custody of the child reverted to the mother. In November 2017, Mark KK. — the child's maternal grandfather (hereinafter the grandfather) — and his wife of over 30 years filed a petition seeking visitation with the child, naming the mother as the respondent. In a March 2018 order, the court dismissed that petition for failure to prosecute and failure to serve the father as a necessary party, determining, sua sponte, that the father's prior judicial consent was invalidated as no adoption of the child ultimately took place.[FN1]
Beginning in June 2018, the father filed various custody and enforcement petitions against the mother. The grandfather also filed a petition for visitation, this time naming both the mother and the father as respondents. After a hearing on all of the petitions was well underway, the parties [*2]reached an agreement. In April 2019, the Family Court of Tompkins County (Cassidy, J.) entered a stipulation and order on consent that, in pertinent part, granted the father and the grandfather "joint custody" of the child with physical placement and final decision-making authority reserved for the grandfather and certain unsupervised visitation for the father, along with a schedule for expansion of the father's parenting time should he meet specified conditions.
In January 2020, the father filed the first of the subject petitions — a violation petition alleging that the grandfather had denied him parenting time on numerous occasions. Following one of the father's visits in February 2020, the grandfather filed an order to show cause alleging that the father sexually molested the child during the visit. Family Court (Wait, J.) in turn issued a temporary order suspending the father's visits, which was later modified to provide for limited supervised visitation pending a hearing.[FN2] The grandfather also filed a petition to modify the April 2019 stipulation and order, seeking full custody of the child and to suspend and/or terminate the father's parenting time. The father then filed his own custody modification petition seeking sole custody of the child. Following a fact-finding hearing on all three petitions, the court concluded, as relevant here, that it was in the child's best interests to award the grandfather sole custody and to terminate the father's parenting time.[FN3] The father appeals.
"'A parent has a claim of custody to his or her child that is superior to all other persons, unless a nonparent establishes that there has been surrender, abandonment, persistent neglect, unfitness, an extended disruption of custody or "other like extraordinary circumstances"'" (Matter of Donna SS. v Amy TT., 149 AD3d 1211, 1212 [2017], quoting Matter of Bennett v Jeffreys, 40 NY2d 543, 544 [1976]).[FN4] Where, as here, there has been no prior finding of extraordinary circumstances, it remains the nonparent's burden to demonstrate the existence thereof and, thus, that he or she has standing to seek custody of another person's child (see Matter of Tiffany W. v James X., 196 AD3d 787, 789 [2021]; Matter of Melissa MM. v Melody NN., 169 AD3d 1280, 1281 [2019]), an inquiry that requires consideration of the "cumulative effect of all issues present in a given case" (Matter of Michael P. v Joyce Q., 191 AD3d 1199, 1200 [2021] [internal quotation marks and citations omitted], lvs denied 37 NY3d 901, 902 [2021]; see Matter of Terry PP. v Domiyon PP., 184 AD3d 914, 915-916 [2020]). If the nonparent satisfies that heavy burden, the question then turns to what custodial arrangement will further the child's best interests, and relevant factors in that analysis include "maintaining stability in the child's life, the quality of the respective home environments, the length of time the present custody arrangement has been in place and each party's past performance, relative [*3]fitness and ability to provide for and guide the child's intellectual and emotional development" (Matter of Sweeney v Daub-Stearns, 166 AD3d 1340, 1342 [2018] [internal quotation marks and citations omitted]; see Matter of Bonnie AA. v Kiya DD., 186 AD3d 1784, 1786 [2020], lv dismissed and denied 36 NY3d 933 [2020]).
To begin, it must be emphasized that, by executing an irrevocable judicial consent to a private placement adoption in 2017, the father clearly evinced his intent to sever his relationship with the child (see generally Matter of Jacob, 86 NY2d 651, 664 [1995]; Matter of De Filippis v Kirchner, 217 AD2d 145, 148 [1995]), irrespective of whether his consent was subsequently invalidated because no adoption proceeding had yet taken place. Deferring to Family Court's express credibility assessments, which include the finding that the father's testimony was wholly unworthy of belief, the hearing evidence also established that the father rarely saw the child. He regularly canceled or simply did not attend scheduled visitations, and, on the limited occasions when he did exercise his visitation rights, he often cut short his own parenting time. According to the aunt, while she was the child's primary physical custodian, the father would almost always return the child to her unfed and in soiled diapers. Evidence was also presented regarding instances of the father's failure to properly care for the child when she was ill during a visit and his poor supervision of the mother's other children when they resided together.
Significantly, credible evidence admitted at the hearing established that the child's physical and emotional safety were compromised while she was in the father's unsupervised care due to his inappropriate physical contact with her. The father also refused to cooperate with DSS and police investigations into the child's allegations. Relatedly, the child was already receiving therapeutic services following an indicated incident with a former partner of the mother — circumstances of which the father was aware. The grandfather's wife, who at times served as a supervisor during the father's parenting time, also offered examples of the need for her to intervene during visits when the father failed to adequately respond to safety concerns or maintain appropriate physical boundaries under the circumstances.
The father also failed to attend any of the child's school activities or otherwise attempt to be involved in her education. This included his failure to attend meetings concerning her special education services, and, at the time of the hearing, he was still unaware of the nature of the services that she required despite being provided with that information directly from the school. He demonstrated a similar lack of awareness regarding the child's physical and mental health needs and providers. The evidence also showed that there were periods of time where the father willfully defaulted on his support obligation and otherwise [*4]failed to provide for the child financially. In the several years leading up to the hearing, the father had been unable to maintain consistent employment and stable housing for himself. For those reasons, and others, he had been unable to satisfy the most basic conditions of the April 2019 stipulation and order so as to expand his parenting time to include overnight visits. In fact, the father has not cared for the child overnight, or for more than a few hours at a time, since 2016. Testimonial and documentary evidence also showed that the father was routinely hostile and antagonistic toward the grandfather regarding matters concerning the child.
In contrast, the grandfather has had primary physical custody of the child since October 2018. Even before that, when the mother or the aunt had custody of the child, he saw the child nearly every day, and both he and his wife were described as nurturing grandparents. The grandfather, along with his wife, has consistently provided for the physical, emotional and educational needs of the child. The evidence also established that they have stable income and a suitable home and that the child has friends and other meaningful connections in their community. Unlike the father, the grandfather remained respectful when the two needed to communicate about custodial matters, and he and his wife went beyond what was required of them in order to facilitate the father's parenting time, including offering him transportation and preparing activities for him and the child, although their efforts were often in vain.
We first agree with Family Court that the grandfather established the requisite extraordinary circumstances to proceed on his petition. The father relinquished custody of the child to the grandfather, among others, for extended periods of time — and in fact previously demonstrated his desire to permanently relinquish his parental rights to the child — and he failed to exercise his parenting time despite numerous opportunities to do so (see Matter of Michael P. v Joyce Q., 191 AD3d at 1201-1203; Matter of Pettaway v Savage, 87 AD3d 796, 798-799 [2011], lv denied 18 NY3d 801 [2011]; Matter of Bohigian v Johnson, 48 AD3d 904, 905 [2008]). He also demonstrated a lack of parental fitness during the times that he did care for the child, and evidence of the child's repeated, consistent and corroborated disclosures regarding the father's inappropriate physical contact with her, which the court was free to credit, particularly in the face of the father's implausible explanations (see e.g. Matter of Lily BB. [Stephen BB.], 191 AD3d 1126, 1128-1129 [2012], lv dismissed 37 NY3d 927 [2021]), only adds to the extraordinary circumstances otherwise established here (see Matter of Daphne OO. v Frederick QQ., 88 AD3d 1167, 1168-1169 [2011]). There is also ample evidence in the record to support Family Court's determination that it was in the child's best interests to award the grandfather sole custody (see Matter [*5]of Tasha AA. v Tammy DD., 178 AD3d 1306, 1308-1310 [2019]; Matter of Darrow v Darrow, 106 AD3d 1388, 1392-1393 [2013]; Matter of Daphne OO. v Frederick QQ., 88 AD3d at 1169; Matter of John HH. v Brandy GG., 52 AD3d 879, 880 [2008]; Matter of Gary J. v Colleen L., 288 AD2d 720, 721-723 [2001]).
Lastly, there is no basis upon which to disturb Family Court's decision to terminate the father's visitation at this juncture. As previously noted, the father routinely failed to avail himself of the parenting time that he was afforded, requiring the grandfather and his wife to distract the child or simply not tell her about possibly seeing the father so as to avoid her confusion or disappointment when he ultimately failed to show up (see Matter of Owens v Chamorro, 114 AD3d 1037, 1039 [2014]; Matter of Robert AA. v Colleen BB., 101 AD3d 1396, 1397-1398 [2012], lv denied 20 NY3d 860 [2013]). The father was also the only person to testify at the hearing that he and the child enjoyed a relationship that was in any way beneficial to her (see Matter of Joshua C. v Yolanda C., 140 AD3d 1213, 1214 [2016]). Most significantly, the credible evidence at the hearing demonstrated, by a preponderance of the evidence (see Matter of Granger v Misercola, 21 NY3d 86, 92 [2013]), that the child's health and safety were compromised while in the father's custody, and that continuing risk to her was detrimental to her welfare (see Matter of Attorney for the Children v Barbara N., 152 AD3d 903, 905-906 [2017]; compare Matter of East v Giles, 134 AD3d 1409, 1410-1412 [2015]).[FN5] We accordingly affirm.
Egan Jr., J.P., Ceresia and Fisher, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: We have obtained the father's executed judicial consent form and the October 2017 and March 2018 orders and take judicial notice thereof (see Matter of Darnell R. v Katie Q., 195 AD3d 1083, 1084 n 1 [2021]; Matter of Montoya v Davis, 156 AD3d 132, 133 n 1 [2017]).

Footnote 2: The parties represented to Family Court that both DSS and local law enforcement declined to take further action with respect to the child's allegations in light of her age and, apparently, a lack of physical evidence.
Footnote 3: The mother's parenting time with the child, as provided for in the April 2019 stipulation and order, remains the same.
Footnote 4: The propriety of the March 2018 finding of Family Court (Kershko, J.) regarding the status of the father's parental rights over the child is not before us. Given that said order, from which no appeal was taken, vacated the father's judicial consent to a private placement adoption, we are required to treat his claim to the child as that of a parent. Thus, contrary to the conclusion of Family Court (Wait, J.), the father was not required to himself establish extraordinary circumstances to proceed on his own petition.

Footnote 5: Although not dispositive (see Matter of Tiffany W. v James X., 196 AD3d at 792; Matter of Bonnie AA. v Kiya DD., 186 AD3d at 1788 n 4), the attorney for the child argues that Family Court's determination should be upheld in its entirety.