Matter of David FF. v Isis GG. (2024 NY Slip Op 06399)

Matter of David FF. v Isis GG.

2024 NY Slip Op 06399

Decided on December 19, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 19, 2024

CV-23-1094
[*1]In the Matter of David FF., Appellant,
v
Isis GG., Respondent. (Proceeding No. 1.) (And Another Related Proceeding.)
In the Matter of Isis GG., Respondent,
v
David FF., Appellant. (Proceeding No. 3.) (And Another Related Proceeding.)

Calendar Date:November 18, 2024

Before:Garry, P.J., Egan Jr., Clark, Pritzker and Mackey, JJ.

Constantina Hart, Kauneonga Lake, for appellant.
Lisa K. Miller, McGraw, for respondent.
Natalie B. Miner, Homer, attorney for the children.

Mackey, J.
Appeals (1) from two orders of the Family Court of Tompkins County (Scott A. Miller, J.), entered May 23, 2023 and June 2, 2023, which, among other things, granted petitioner's application, in proceeding No. 3 pursuant to Family Ct Act article 8, finding respondent to have committed family offenses, and issued an order of protection, and (2) from an order of said court, entered May 19, 2023, which, in proceeding No. 3 pursuant to Family Ct Act article 8, revoked respondent's pistol permit.
David FF. (hereinafter the father) and Isis GG. (hereinafter the mother) are the parents of two children (born in 2015 and 2019). The mother and the father had been in a polyamorous marriage, but separated in April 2021, although they continued to cohabit for a time and took turns caring for the children. In June 2021, the father filed an initial custody petition as well as a family offense petition, alleging that the mother committed harassment in the first or second degree. The father also sought a temporary order of protection against the mother, which was granted in June 2021, requiring the mother to stay away from the father and the marital home. However, the parents exercised a 50/50 parenting time schedule for the subject children throughout the proceedings. In August 2021, the mother filed her own set of custody and family offense petitions. She alleged in her family offense petition that the father committed the family offenses of disorderly conduct, harassment in the first or second degree, aggravated harassment in the second degree, assault in the second or third degree, strangulation, menacing in the second or third degree, reckless endangerment, stalking, attempted assault, sexual misconduct, rape, forcible touching and obstruction of breathing or blood circulation.
After a nine-day fact-finding hearing that spanned over two years, Family Court awarded the mother sole legal and primary physical custody of the children, with unsupervised parenting time to the father every other weekend. The court also found that the father had committed the family offenses of obstruction of breathing or blood circulation on three occasions, assault and harassment in the second degree.[FN1] An order of protection was then issued, as well as an order revoking the father's pistol permit and directing him to surrender his firearms. The father appeals.[FN2]
The father contends that Family Court erred in sustaining the mother's family offense petition. "In [a] family offense proceeding[ ], [the] petitioner [is] obliged to prove by a fair preponderance of the evidence that [the] respondent committed one of the family offenses set forth in Family Ct Act § 821 (1) (a). Whether a family offense has been committed is a factual issue for Family Court to resolve, and [this Court] accord[s] great weight to its assessments of witness credibility" (Matter of Carly W. v Mark V., 225 AD3d 984, 985 [3d Dept 2024] [citations omitted]; see Matter of Derek KK. v Jennifer KK., 196 AD3d 765, 769[*2][3d Dept 2021]).
The mother alleged that the father was physically and emotionally abusive throughout their relationship. She testified that in 2012, the father became enraged during a verbal argument, flipped over the dining room table, broke a chair and then pushed her down on the couch while choking her. She remembered seeing "like lights that were sparkled in the air" and that "he was pushing his weight into . . . [her] neck." She experienced "a gone spot in [her] memory," but did not think that she lost consciousness. She testified further that in August 2016, the father came into their bedroom late at night while intoxicated and began to fondle her while she slept in the bed with the older child. When she rebuffed him, the father allegedly stood up and urinated on her and the older child and then attacked her by grabbing her by the throat and pushing her against a window. While choking her he also shook her violently, "like when a dog catches something." The mother stated that the father strangled her another time when she attempted to flee the home with one of the children in her arms, again violently shaking her and banging her head against the door to the point that she saw stars and lights. She testified that this incident culminated in the father screaming on the porch and threatening to release her dogs into traffic. The mother testified that she stayed at a friend's house for a time after that incident, during which the father repeatedly stopped by despite her telling him not to, and tried to have sex with her on her friend's couch.
The mother testified that in 2021, the father asked her for sex after she told him she wanted a divorce. When she denied him, he allegedly withdrew $1,000 from her bank account. The mother further testified that in July 2014, the father anally raped her after she refused his demand for sex. In 2017, the mother texted the father that they needed to be careful with their money. The father replied by threatening to take a "different approach" in their next conversation and promising her that she would not like it. When the mother replied by asking him to stop texting her, he replied that when he got home he was going to ask her if she wanted "to do this the hard way or the easy way" and that the hard way entailed her "finding out just how much of an a**hole [he] can be."
The mother testified that in 2019, she and the father argued over putting the older child to bed. The father began yelling at her for refusing him help and "pulled" the older child out of the mother's arms and set her in his room before returning to scream at the mother. The father broke a door down during this incident. The mother stated that the father would often break down doors, punch holes in walls and exhibit general physical violence every few months. She also testified that she witnessed the father strangle her sister and the father's sister. One altercation took place in August 2017 when the mother's sister insulted the father's [*3]intelligence, to which he replied "I'm going to f***ing kill you" and put his hands around her neck. This incident was corroborated by the testimony of the mother's sister. The mother testified that, although the father never actually hit her, he threatened to do so and on multiple occasions punched holes in walls and doors. She also recounted a violent incident that occurred in 2016, in which she witnessed the father drag his 13- or 14-year-old son up the stairs by the back of his shirt.
The father generally denied the mother's allegations, instead portraying her as the aggressor. He testified that, during an argument in the fall of 2015, the mother was suffering from postpartum depression and attacked him with a knife in the kitchen, "pretty much" cutting the tip of his finger off. He sought medical attention but did not disclose to the hospital how he was injured. The father further testified that, in August 2016 the mother was angry with him for having tracked grass and dirt into the bedroom and hit him on the back of the head. He denied drinking too much, testifying that he only drank a beer or two "a few times a week" and smoked marihuana "very rarely." He also denied causing damage to the house in fits of rage, stating that the house was old and merely had wear and tear.
The parties' marriage counselor testified that the mother never indicated to her that the father raped, strangled or urinated on her. However, she confirmed that the father exhibited "intense" anger at times during sessions and she was concerned that the father might sometime harm the mother. A woman that the father dated while he was still together with the mother (hereinafter the paramour), testified that she was concerned over volatility in the mother and the father's relationship and that the father would become "very irritated" if the mother did not have sex with him. She testified that small things such as a book on the floor would cause him to yell and scream and that she witnessed him do so on most of her visits to the home. She recounted times when the father would yell at her children and testified that she had seen him throw things and slam doors "often." She also recalled multiple times that he threatened to kill a man the mother was dating and further testified that she witnessed the father use cocaine, marihuana and hallucinogenic mushrooms.
The paramour testified that she had stayed at the parties' home overnight in June 2021 and was in the father's bedroom when the younger child crawled into the room with her. The mother collected the child and took him to her room, then the paramour heard the mother and the father screaming and yelling. The father came into the room and "threw" the child at the paramour before leaving again and continuing to yell. The mother then came into the room and took the child from the paramour and she and the father continued to yell about who was supposed to be taking care of the children. The paramour testified that the father and [*4]the mother proceeded to push each other while one of them was holding the child, before the father got ahold of him and gave him back to the paramour. According to the paramour, the mother "tapped" the father on the back of the head with her open hand before the father turned around and "shovel[ed]" her into a bookshelf and out of the room, slamming the door. The father sat against the door to keep it closed while the mother attempted to get in by slamming herself against it and the father called the police. In the paramour's opinion, the father was generally the aggressor in arguments. She recounted hearing the father lie to his lawyer about using drugs and expressed her fear that the father would ask her to lie for him.
Family Court found "[t]he father's denials of domestic violence . . . simply not credible" and that the mother "was the victim of egregious domestic violence, perpetrated by [the father]." Deferring to Family Court's credibility determinations in favor of the mother, the mother's sister and the paramour, we find no basis in the record to disturb its finding that the father thrice committed the family offense of obstruction of breathing or blood circulation (see Penal Law § 121.11 [a]; Matter of Davis v Davis, 221 AD3d 1312, 1314-1315 [3d Dept 2023]; Matter of Jesse Z., 116 AD3d 1105, 1107-1108 [3d Dept 2014]), harassment in the second degree (see Penal Law § 240.26 [3]; Matter of Davis v Davis, 221 AD3d at 1313-1314; Matter of Angelique QQ. v Thomas RR., 151 AD3d 1322, 1323-1324 [3d Dept 2017]; Matter of James XX. v Tracey YY., 146 AD3d 1036, 1039 [3d Dept 2017]; Matter of Joan FF. v Ivon GG., 85 AD3d 1219, 1219-1220 [3d Dept 2011]) and assault [FN3] (see Penal Law § 120.00; People v Haardt, 129 AD3d 1322, 1323-1324 [3d Dept 2015]). Conversely, the single hit on the back of the father's head by the mother did not constitute "a series of acts over a period of time, however short, evidencing a continuity of purpose" to alarm or seriously annoy the father (Matter of Tiffany W. v James X., 196 AD3d 787, 792-793 [3d Dept 2021]; see Matter of Davis v Davis, 221 AD3d at 1314). Accordingly, Family Court properly dismissed the father's family offense petition against the mother.
We reject the father's argument that Family Court erred by permanently revoking his pistol permit. As relevant here, when an order of protection is entered as part of an order of a disposition in a Family Ct Act article 8 proceeding, "the court shall revoke any [firearms] license possessed by the respondent, order the respondent ineligible for such a license, and order the immediate surrender . . . of any or all firearms, rifles and shotguns owned or possessed where the court finds that the conduct which resulted in the issuance of the order of protection involved (i) the infliction of physical injury, as defined in [Penal Law § 10.00 (9)]." (Family Court Act § 842-a [2] [a]). " 'Physical injury' means impairment of physical condition or substantial pain" (Penal Law[*5]§ 10.00 [9]). Although the mother did not testify as to the level of pain caused by the father's attacks, the record clearly demonstrates that she suffered an impairment of physical condition when he repeatedly strangled her to the point that she saw stars and suffered memory loss.
Further, contrary to the father's contention, Family Court's determination to award the mother sole custody of the children has a sound and substantial basis in the record. "In an initial custody proceeding, Family Court's paramount consideration is to determine the custodial arrangement that would promote the best interests of the child[ren]. Given Family Court's superior ability to observe the witnesses and evaluate credibility, [this Court] defer[s] to Family Court's factual findings and credibility determinations and will not disturb its determination if supported by a sound and substantial basis in the record" (Matter of Darnell R. v Katie Q., 195 AD3d 1083, 1084 [3d Dept 2021] [internal quotation marks and citations omitted]; see Matter of Christopher L. v Paula L., 212 AD3d 1060, 1061 [3d Dept 2023]). "In conducting a best interests analysis, courts must consider a variety of factors, including the quality of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being" (Matter of Christopher L. v Paula L., 212 AD3d at 1061; accord Matter of Alicia SS. v Andrew RR., 224 AD3d 1207, 1209 [3d Dept 2024]). While joint custody is an aspirational goal in every custody matter, it may not be feasible where parents are unable to effectively communicate with one another about the children's needs (see Matter of Brenna EE. v Andrew DD., 214 AD3d 1039, 1040 [3d Dept 2023]; Elizabeth B. v Scott B., 189 AD3d 1833, 1835-1836 [3d Dept 2020]).
The hearing evidence demonstrated that the father has perpetrated multiple, escalating acts of domestic violence against the mother. His denials of ever screaming or being physically rough with the children are also unconvincing as the mother's testimony to the contrary was corroborated by his paramour's eyewitness account. The hearing evidence further demonstrated that the father used illegal drugs in the presence of the children. Additionally, the evidence reflected that the parties' attempts to communicate routinely deteriorated into argument and that they have been unable to communicate about, or for the good of, the children. Considering this evidence, we find that a sound and substantial basis exists in the record to support Family Court's determination that an award of sole legal and primary physical custody to the mother is in the children's best interests (see Matter of Justin K. v Jutonynea L., 221 AD3d 1335, 1337 [3d Dept 2023]; Matter of Warda NN. v Muhammad [*6]OO., 217 AD3d 1086 [3d Dept 2023]; Matter of Stephanie R. v Walter Q., 203 AD3d 1440, 1443 [3d Dept 2022]; Matter of Nicole V. v Jordan U., 192 AD3d 1355, 1357-1358 [3d Dept 2021]; Matter of Samantha GG. v George HH., 177 AD3d 1139, 1140-1141 [3d Dept 2019]).
As to parenting time, Family Court is afforded wide discretion in crafting an appropriate parenting schedule. On this record, we discern no basis upon which to disturb the parenting schedule fashioned by Family Court as it is reasonable, in the best interests of the children, provides the father with meaningful access to the children and is supported by a sound and substantial basis in the record (see Matter of Henry CC. v Antoinette DD., 222 AD3d 1231, 1234 [3d Dept 2023]; Matter of Amanda YY. v Ramon ZZ., 167 AD3d 1260, 1262 [3d Dept 2018]; Matter of Charles I. v Khadejah I., 149 AD3d 1422, 1424 [3d Dept 2017]). Further, the mother's testimony demonstrated her willingness to ensure the father's frequent and regular contact with the children. The father's remaining contentions, to the extent that they have not been addressed, have been considered and found to be lacking in merit.
Garry, P.J., Egan Jr., Clark and Pritzker, JJ., concur.
ORDERED that the orders are affirmed, without costs.

Footnotes

Footnote 1: Family Court did not specify whether the father had committed assault in the second or third degree.

Footnote 2: Although not dispositive, we note that the attorney for the children supports Family Court's determination.

Footnote 3: As noted above, Family Court did not specify whether the father had committed assault in the second or third degree. We find that the record supports a finding that he committed assault in the third degree.